UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MARITZA MONTANEZ

V. CASE NO. 3:15 CV 397 (VAB)

D & D AUTO, LLC d/b/a FAIRFIELD HYUNDAI
SAFE-GUARD PRODUCTS INTERNATIONAL, LLC

OPPOSITION TO SAFE-GUARD MOTION FOR SUMMARY JUDGMENT

As applied to Safe-Guard, the complaint alleges that: "The service contract, drafted by Safe-Guard, consisted of 11 pages of fine print, contrary to the requirements of Magnuson-Moss that service contracts must fully, clearly, and conspicuously disclose their terms and conditions in simple and readily understood language." ¶11

Safe-Guard asks for summary judgment on three grounds. First, it claims that the terms of the contract do not cover the knock sensor problem that Ms. Montanez experienced. Doc. # 43 at 5 ff. Since Ms. Montanez was not given the cover sheet that limited the terms of the service contract she was given, she is not bound by it. Indeed, there is a question of fact whether she signed the cover page at all. Her affidavit says she did not. This controverted fact precludes summary judgment.

Second, Safe-Guard contends that the Magnuson-Moss Act does not apply because of the McCarran-Ferguson Act. Doc. # 43 at 9-13. Its assertion is erroneous as a matter of law. The extended warranty/ service contract is not exempted by McCarran-Ferguson. On its face the document given to Ms. Montanez does not comply with Magnuson-Moss because the 11 pages of fine print covering three different contracts does not fully, clearly, and conspicuously disclose its terms and conditions in simple, understandable language..

Third, Safe-Guard claims that the contract satisfies the requirements of federal and state law. Doc. # 43 at 13. To the contrary, a jury could readily find that what the dealer gave her was not simple or understandable, but was instead deceptive or misleading.

Plaintiff disputes crucial facts that Safe-Guard claims are undisputed, as set forth in her Local Rule 56(2) Statement filed herewith.

Summary of Facts Undisputed by Plaintiff. On May 19, 2014, Ms. Montanez bought a used 2012 Mini Cooper from Fairfield Hyundai pursuant to a Retail Installment Contract financed by Fifth Third Bank. The dealer gave her a price deduction of $2,500 on her trade-in. Not coincidentally, the dealer then included in the Contract an added $2,500 for "Hyundai P P." On the same date, Ms. Montanez received various documents including pages 2-11 of a fine print vehicle service contract, but no cover page. After this action was brought, the dealer produced a cover page dated May 22, 2014 -- three days later -- issued by Safe-Guard (no mention of Hyundai).

The Mini-Cooper had already been the subject of at least three Technical Service Bulletins relating to a knock sensor problem: June 2012 and August and November 2013 (detailed at Doc. # 40, p.2 n.2), The first page in Ms. Montanez's possession, page 2, showed knock sensor coverage. Doc. # 45-1 p. 2 (electrical, line 6). When the engine light stayed on, the problem was the very knock sensor problem that pre-existed the sale.

Plaintiff brought this suit the day after Safe-Guard refused the knock sensor coverage she thought she was entitled to based on the policy pages she had been given. The complaint is based largely on the dealer's several misrepresentations (including as to the service contract), its violation of the Truth in Lending Act and the Connecticut Unfair Trade Practices Act and its breach of the duty of good faith and fair dealing.

The only allegations relating to Safe-Guard are its refusal to repair under the pages of the service contract she was given, and its noncompliance with Magnuson-Moss because the document did not "fully, clearly, and conspicuously disclose their terms and conditions in simple and readily understood language."

I. The McCarran-Ferguson Act does not prevent application of the Magnuson-Moss Act.

Safe-Guard seeks summary judgment based on its erroneous claim that the service contract is not subject to the Magnuson-Moss Warranty Act, 15 U.S.C. §2301. The Regulation, 16 C.F.R. § 700.11 (copy attached) establishes the contrary:

> (a) . . .The McCarran-Ferguson Act, 15 U.S.C. 1011 *et seq.,* provides that most federal laws (including the Magnuson-Moss Warranty Act) shall not be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance. While three specific laws are subject to a separate proviso, the Magnuson-Moss Warranty Act is not one of them. Thus, to the extent the Magnuson-Moss Warranty Act's service contract provisions apply to the business of insurance, they are effective so long as they do not invalidate, impair, or supersede a State law enacted for the purpose of regulating the business of insurance.

*See also* Humana Inc. v. Forsyth, 525 U.S. 299, 301 (1999) ("[W]hen application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application.").

Safe-Guard's claim that Magnuson-Moss does not apply because of the McCarran-Ferguson Act is in error and does not form the basis for summary judgment. *Because* the service contract does not comply with Magnuson-Moss, as set forth below, summary judgment as a matter of law may enter for plaintiff instead.[1]

---

[1] Summary judgment can enter for the nonmoving party as to the issues raised by the moving party. *Travelers Cas. & Sur. Co. v. Gerling Global Reinsurance Corp. of Am.*, 419 F.3d 181, 190-191 (2d Cir. 2005); *New England Health Care Employees Union v. Mt. Sinai Hosp*., 65 F.3d 1024, 1029 (2d Cir. 1995) (summary judgment may enter for nonmoving party); *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir. 1991) (same).

II. The service contract did not comply with Magnuson-Moss as a matter of law.

Congress noted when it enacted the Magnuson-Moss Warranty Act "the developing awareness that the paper with the filigree border bearing the bold caption 'Warranty' or 'Guarantee' was often of no greater worth than the paper it was printed on. Indeed, in many cases where a warranty or guarantee was ostensibly given the old saying applied 'The bold print giveth and the fine print taketh away.' " H.R. Rep. 93–1107, 93d Cong., 2d Sess., reprinted in 1974 U.S.C.C.A.N. 7702, 7706.

The Act, §2306(a), permits a service contract "if such contract fully, clearly, and conspicuously discloses its terms and conditions in simple and readily understood language." One has to carefully parse the fine print in order to realize that the policy costing $2,500 reduced coverage to very little. The policy is not simple or readily understood.

Ten single space pages of fine print. Plaintiff submits that the Court can decide, as a matter of law, that the service contract that the dealer gave Ms. Montanez was not simple or understandable. Alternatively, a jury could readily find that what the dealer gave her was not simple or understandable, but was instead deceptive or misleading in violation of the Act. The 10 pages of fine print cover three *different* plans, and include pages of irrelevant state specific provisions that could be omitted in the forms given to Connecticut dealers. The drafters buried the multiple exclusions on page 4. Safe-Guard can provide a contract geared to a specific coverage, as show by Doc. # 41-1 pp. 51 (Platinum contract), 21, 42, 61, 60.

The policy the dealer claims to have sold plaintiff was exceptionally limited. The dealer did not tell her about those limitations, or that exclusions 1, 3, 4, 13 ("any part that is not specifically listed") and 19 exclude most normal scenarios. Safe-Guard no doubt has lawyers well versed in drafting the 10 page fine print service contract, to make the service

contract seem to cover everything under the sun while actually covering virtually nothing once the carefully crafted exclusions and limitations are parsed. One would have to be the proverbial "Philadelphia lawyer" to understand the document.

As Congress said, "'The bold print giveth and the fine print taketh away.' " H.R. Rep. 93–1107, 93d Cong., 2d Sess., reprinted in 1974 U.S.C.C.A.N. 7702, 7706.

The single space fine print, the multiple coverages, and the superfluous language *enable* the dealer to exploit the buyer. As the Supreme Court stated in the general context of consumer protection, "it does not seem 'unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line.' " FTC v. Colgate-Palmolive Co., 380 U.S. 374, 393, 85 S.Ct.1035, 1047, 13 L.Ed.2d 904 (1965) (quoting Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 340, 72 S.Ct. 329, 330-31, 96 L.Ed. 367(1952)). That principle is applied in the Second Circuit as well: Russell v. Equifax A.R.S., 74 F.3d 30, 35 (2d Cir. 1996); Rosa v. Gaynor, 784 F. Supp. 1 (D. Conn. 1989) (Cabranes, J).

III. Because of its turgid and lawyerly language, the service contract did not comply with federal or state law.

Safe-Guard claims it has complied with the federal and state checklists of what must be disclosed.[2] But Safe-Guard cannot claim that the disclosure was full or conspicuous (since it includes mostly inapplicable material for the consumer to wade through about other coverages and other state laws). Nor can Safe-Guard claim that the document uses simple and readily understood language. On the Insurance Department form, Safe-Guard left the "Readability Score" blank. Doc. # 43-1 at 7, 9.

The undersigned used http://www.readabilityformulas.com/freetests/six-readability-formulas.php to analyze the readability of the first paragraph under "II What This Service Contract Covers." The Grade Level was 19; it was "very difficult to read"; the age of the reader was "College graduate" level; the average number of words per sentence was 39; 17% of the text had three or more syllables. That is not "simple and readily understood language."

Connecticut has a statute that explains how to determine whether a document is simple and readily understandable. Even if the statute is inapplicable, its guidance is telling: this service contract was not simple or readily understandable.

> Conn. Gen. Stat. §42-152 (b) Plain language tests. A consumer contract is written in plain language if it substantially complies with all of the following tests:
>
> (1) It uses short sentences and paragraphs; and
>
> (2) It uses everyday words; and
>
> (3) It uses personal pronouns, the actual or shortened names of the parties to the contract, or both, when referring to those parties; and
>
> (4) It uses simple and active verb forms; and
>
> (5) It uses type of readable size; and
>
> (6) It uses ink which contrasts with the paper; and
>
> (7) It heads sections and other subdivisions with captions which are in boldface type or which otherwise stand out significantly from the text; and
>
> (8) It uses layout and spacing which separate the paragraphs and sections of the contract from each other and from the borders of the paper; and
>
> (9) It is written and organized in a clear and coherent manner.
>
> (c) Alternate objective tests. A consumer contract is also written in plain language if it fully meets all of the following tests, using the procedures described in section 42-158:

---

[2] The document does not appear to include item 7 of the Connecticut checklist, or at least it is not clearly or conspicuously disclosed.

(1) The average number of words per sentence is less than twenty-two; and

(2) No sentence in the contract exceeds fifty words; and

(3) The average number of words per paragraph is less than seventy-five; and

(4) No paragraph in the contract exceeds one hundred fifty words; and

(5) The average number of syllables per word is less than 1.55; and

(6) It uses personal pronouns, the actual or shortened names of the parties to the contract, or both, when referring to those parties; and

(7) It uses no typeface of less than eight points in size; and

(8) It allows at least three-sixteenths of an inch of blank space between each paragraph and section; and

(9) It allows at least one-half of an inch of blank space at all borders of each page; and

(10) If the contract is printed, each section is captioned in boldface type at least ten points in size. If the contract is typewritten, each section is captioned and the captions are underlined; and

(11) It uses an average length of line of no more than sixty-five characters.

A. Magnuson-Moss. Because the document is not readable by the average consumer, it does not comply with the Magnuson-Moss Act. It is so complex as to be deceptive and misleading. Note that approximately 40% of the American population lacks the literacy skills to fill out job applications or bank deposit slips correctly.[3] Nearly half of American consumers read at no more than an 8th grade level. Already challenged by these basic skills deficiencies, a typical car buyer suffers further at the hands of aggressive and experienced car sales tactics as a result of her trusting nature or inexperience.

---

[3]Nat'l. Ctr. for Educ. Statistics, National Assessment of Adult Literacy (2003); U.S. Dep't of Educ., National Ctr. for Educ. Statistics, Adult Literacy in America (Sept. 1993) (available from the U.S. Gov't Printing Office, GPO stock number 065-000-00588-3), discussed in, e.g., Alan M. White & Cathy Lesser Mansfield, Literacy and Contract, 13 Stan. L. & Pol'y Rev. 233, 235–242 (2002). *See also* Nat'l. Center for Education Statistics, http://nces.ed.gov/naal/index.asp.

B. Connecticut Law. The contract does not comply with Connecticut law either. It includes at least three very different warranty coverages. However, § 42-260 refers to "an" extended warranty in (2) and (3), and "a clear description of **the** product" in (c) (1). See also (c) (5) "the" extended warranty. We have a document that includes other inapplicable warranties, not “the” warranty or “the product” sold to Ms. Montanez.

The over-arching Unfair Insurance Practices Act prohibits unfair or deceptive acts or practices in the sale of insurance. Conn. Gen. Stat. §38a-815 *et seq.* The Unfair Trade Practices Act also applies. Mead v. Burns, 199 Conn. 651, 662, 509 A.2d 11, 17 (1986) (“the legislature elected to subject insurance practices to multiple rather than to singular regulatory supervision”). See §38a-817(d): “No order of the commissioner under sections 38a-815 to 38a-819, inclusive, shall relieve or absolve any person affected by such order from any liability under any other laws of this state.”

Even if the Insurance Department clerk allowed Safe-Guard to file the form, she did not look beyond the form to ascertain whether it was used unfairly or deceptively. That is for the court or the jury to determine in this matter.

V. Safe-Guard cannot rely on the cover page that was not given to Ms. Montanez

Safe-Guard’s affidavit, which states “on information and belief” that the cover page was given to Ms. Montanez, is not admissible evidence. The affiant would not be competent to testify at trial, relying as she does on hearsay and guesswork. Fed. R. Civ. P. 56 (c)(2). Affidavits based on “information and belief” are inadmissible. Chandler v. Coughlin, 763 F.2d 110 (2d Cir 1985).

Moreover, Safe-Guard objected to providing, and did not provide, any documentation related to its acquisition of the warranty, such as the electronic notice it

mentions in its affidavit, or payment of a premium. See attached responses to discovery. Fed. R. Civ. P. 37(c)(l) establishes a self-executing preclusion against the portions of the affidavit relating to the warranty. See Zhang v. Am. Gem Seafoods. Inc.,. 339 F.3d 1020, 1028 (9th Cir. 2003) (strictly following Rule 37 to exclude document when it was produced after discovery cut-off date; and after deposition for which document was to be used; and no "substantial justification" given for failure to produce);

Most important, the document was NOT given to Ms. Montanez. Ms. Montanez so affirms. It is well-established that a court will not consider a document whose authenticity is disputed on a dispositive motion.

> *See Faulkner v. Beer*, 463 F.3d 130, 135 (2d Cir.2006) (holding that "if a plaintiff had not received a copy of [documents referenced in the contract], then that plaintiff's claims could not be dismissed based on warnings of risk in those documents"); *Chiacchia v. Nat'l Westminster Bank*, 124 A.D.2d 626, 507 N.Y.S.2d 888, 888 (2d Dep't 1986) (holding that the doctrine of incorporation by reference "is grounded on the premise that the material to be incorporated is so well known to the contracting parties that a mere reference to it is sufficient").

Orlander v. Staples, Inc., 802 F.3d 289, 295 n.6 (2d Cir. 2015); DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (same). "Moreover, 'even if a document is "integral" to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir.2006)." Alvarez v. Cty. of Orange, N.Y., 95 F. Supp. 3d 385, 396 (S.D.N.Y. 2015).

V. The problems addressed by Magnuson-Moss persist and are demonstrated by this case

The Magnuson –Moss Act was enacted "[i]n order to improve the adequacy of information available to consumers, prevent deception, and improve competition in the marketing of consumer products. 15 U.S.C.§2302(a). The Act, §2306(a), permits a service contract only "if such contract fully, clearly, and conspicuously discloses its terms and conditions in simple and readily understood language." This case shows the Magnuson-Moss Act still needs enforcement, to preclude the consumer deception shown here.

Automotive service plans sold by third-party companies, as here, remain a particular problem. There have been many complaints from customers who say the providers often refuse to pay claims, often saying the problem isn't covered. In 2011, the St. Louis-based Better Business Bureau issued a critical report of the industry titled, "Vehicle Service Contract Industry. How Consumers Lost Millions of Dollars."

http://stlouis.bbb.org/storage/142/documents/vehicleservicecontractstudy2011.pdf

A. Gobbledygook, rather than simple understandable language persists.

> For many years warranties have confused and misled the American consumer. A warranty is a **complicated legal document** whose full essence lies buried in myriads of reported legal decisions and in complicated State codes of commercial law. **The consumer's understanding of what a warranty on a particular product means to him frequently does not coincide with the legal meaning.**... Typically, a consumer today cannot bargain with consumer product manufacturers or suppliers to obtain a warranty or to adjust the terms of a warranty voluntarily offered. Since almost all consumer products sold today are typically done so with a contract of adhesion, there is no bargaining over contractual terms.

Legislative History of Magnuson Moss Warranty Act, S. Rep. 93–151, 93d Cong., 1st Sess., quoted in 40 Fed.Reg. 60168 (1975) (emphasis added).

"Next to a house, a car is perhaps the most significant purchase that most consumers make." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. Abrams, 899 F.2d 1315, 1316 (2d Cir. 1990).

> After many years of study, and partially in response to "a rising tide of complaints ... from irate owners of motor vehicles complaining that automobile manufacturers and dealers were not performing in accordance with the warranties on their automobiles," H.R.Rep. No. 93–1107, 93rd Cong., 2d Sess. (1974), reprinted in 1974 U.S.Code Cong. & Admin.News 7702, 7708, Congress passed the Magnuson–Moss Warranty Act (the Act) in 1975. See Pub.L. 93–637, 88 Stat. 2183. The thrust of the Act is disclosure. "In order to improve the adequacy of information available to consumers, prevent deception, and improve competition in the marketing of consumer products," the Act requires that "any warrantor warranting a consumer product" must "fully and conspicuously disclose in simple and readily understood language the terms and conditions of such warranty." 15 U.S.C. § 2302(a). The Act does not require that a warranty be provided, but mandates that, if one is given, it not be misleading.

Id. at 1317. The ten pages of fine print and convoluted language used in this matter show the crucial importance of simple and understandable language.

B. Disparate overpricing remains a problem.

"Consideration of these proclamations regarding Congress's objectives, in light of the [Magnuson-Moss] Act's provisions themselves, reveals that congressional concern with the disparate economic strength of consumers and warrantors." Boyd v. Homes of Legend, Inc., 981 F. Supp. 1423, 1439-40 (M.D. Ala. 1997). Congress was "motivated by its recognition that written warranties were often associated with contracts of adhesion entered into by parties with unequal bargaining power." Id.

In connection with the sale of the service contract, Ms. Montanez, a female Hispanic, may well have been exploited by the dealer. Defendants refused to answer any discovery as to comparative pricing of the extended warranty, and did not give her any explanation of its very limited, virtually worthless, coverage.

Many years ago, Prof. Ian Ayres published a seminal study, Fair Driving: Gender and Race Discrimination in Retail Car Negotiations, 104 Harvard Law Review 817 (1991). The study concluded, "[W]hite males receive significantly better prices than blacks and women. As detailed below, white women had to pay forty percent higher markups than white men; black men had to pay more than twice the markup, and black women had to pay more than three times the markup of white male testers."

Price discrimination is still alive and well, according to an industry trade publication:

> "Disparate impact" has become a regulatory and auto lending industry buzz term. The Consumer Financial Protection Bureau has said that dealerships' ability to adjust their retail margin, or reserve, on consumer auto loans case by case has resulted in minorities paying higher interest rates. That disproportionate adverse effect -- or disparate impact -- amounts to illegal discrimination, the bureau says.
>
> The CFPB claims it found minority loan pricing disparities related to dealer-assisted financing in the auto portfolios of Ally Financial, American Honda Finance and **Fifth Third Bank.** Honda Finance and Fifth Third agreed to limit dealerships' retail margin on loans as part of their settlements. Ally did not. It was assessed $18 million in civil penalties. All three companies denied discrimination.

http://www.autonews.com/article/20151214/FINANCE_AND_INSURANCE/312149986/sales-of-service-contracts-and-f?i-add-ons-critical= (emphasis added.)

Here's more:

> Given the car industry's predilections, all consumers --rich or poor, black or white, good credit or bad --should be wary when they step onto an automobile lot. But an examination of lawsuits and academic studies from around the country provides evidence that the worst abuses are most frequently targeted at African American, Hispanic, elderly, working class, or credit-impaired customers. Many dealers and lenders perceive these consumers as having fewer options, less financial experience, and a diminished sense of marketplace entitlement, thus making them more likely to be desperate or susceptible when it comes time to close the deal.
>
> And the deals that are being closed on many car lots are not pretty ones. Subprime borrowers often pay interest rates between 17 and 25 percent on auto loans, compared to single-digit rates for borrowers with good credit and strong bargaining skills. This is no small matter: the difference between paying a competitive rate or a subprime one can mean $3,000, $4,000, or more in extra finance charges on a five-year, $10,000 used-car loan. These customers are also

> more likely to be targeted by dealers and lenders for an array of overpriced extras: credit insurance, roadside assistance plans, extended warranties, service contracts.

http://www.southernstudies.org/reports/driventomisery.htm

Significantly, defendants refused to answer any discovery directed at comparative pricing of extended warranties.

> The consumer would have a greater incentive to shop around for an extended warranty, rather than take the one offered by the dealer, if he realized that the dealer was charging what the defendants' lawyer described as a "commission," and apparently a very sizable one, for its efforts in procuring the warranty from a third party. Or the consumer might be more prone to haggle than if he thought that the entire fee had been levied by a third party and so was outside the dealer's direct control. Or he might go to another dealer in search of lower mark-ups on third-party charges.

Gibson v. Bob Watson Chevrolet-Geo, Inc., 112 F.3d 283, 286 (7th Cir. 1997).

C. Financial experts counsel against buying an extended warranty, but the dealer did not disclose any of these drawbacks:

> A survey conducted by the Consumer Reports National Research Center in late 2013 found that 55 percent of owners who purchased an extended warranty hadn't used it for repairs during the lifetime of the policy. And, on average, those who did use it spent hundreds more for the coverage than they saved in repair costs.
>
> Among survey participants who used their policy, the median out-of-pocket savings on repairs covered by extended warranties for all brands was $837. Based on a $1,214 average initial cost, that works out to a net loss of more than $375. Factoring those who didn't use their policy, the median savings was zero. And that may have something to do with why satisfaction with automobile extended warranties is among the lower rated of all products and services surveyed by Consumer Reports, and why only about a quarter of respondents said they would definitely get it again.
>
> **Clichés about reading the fine print are especially appropriate when talking about extended warranties. The brochure may present the service plan as "comprehensive," but the contract will likely have numerous limitations, such as requiring documented service at in-network shops and covering only certain parts, rather than whole systems.**

http://www.consumerreports.org/cro/news/2013/07/is-it-worth-buying-an-extended-car-warranty/index.htm (emphasis added).

> Consumers might do well to consider the advice of their fellow consumers, who've learned from bitter experience that purchasing an extended warranty does not always provide the peace of mind and financial protection they assumed it would.
>
> Abdellah, or Norwalk, Connecticut, paid $1326 for an extended warranty on his used car two years ago, but if he had it to do over, he would decline.
>
> "Extended warranties are a waste of money and will only add to your frustrations. Since I bought this extended warranty in August 2003, they paid for about $300 worth of services done to my car on two occasions, where I had to pay $50 deductible on both jobs. Now I paid over $600 myself to do the timing belt job. Considering what I paid for the warranty, and the runaround I was given, I don't see any sense of having an extended warranty. It's a waste of money, time and added frustration."

http://www.consumeraffairs.com/news04/2005/extended_warranty.html

CONCLUSION

Summary judgment cannot be granted to Safe-Guard, because (a) a reasonable jury could conclude that the document was deceptive; (b) a reasonable jury --or jurist --could conclude that the contract was not in simple and readily understandable language as required by the Magnuson-Moss Act; or (c) there is no evidence that the limiting cover page was provided to or signed by plaintiff. The Court is respectfully requested to enter summary judgment in favor of plaintiff on her claim that the policy violated the Magnuson-Moss Warranty Act.

THE PLAINTIFF

Joanne S. Faulkner

By_____/s/ Joanne S. Faulkner __
Joanne S. Faulkner ct04137
123 Avon Street
New Haven CT 06511-2422
(203) 772-0395

# ELECTRONIC CODE OF FEDERAL REGULATIONS

**e-CFR data is current as of February 9, 2016**

Title 16 → Chapter I → Subchapter G → Part 700 → §700.11

Title 16: Commercial Practices
PART 700—INTERPRETATIONS OF MAGNUSON-MOSS WARRANTY ACT

---

**§700.11 Written warranty, service contract, and insurance distinguished for purposes of compliance under the Act.**

(a) The Act recognizes two types of agreements which may provide similar coverage of consumer products, the written warranty, and the service contract. In addition, other agreements may meet the statutory definitions of either “written warranty” or “service contract,” but are sold and regulated under state law as contracts of insurance. One example is the automobile breakdown insurance policies sold in many jurisdictions and regulated by the state as a form of casualty insurance. The McCarran-Ferguson Act, 15 U.S.C. 1011 *et seq.*, provides that most federal laws (including the Magnuson-Moss Warranty Act) shall not be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance. While three specific laws are subject to a separate proviso, the Magnuson-Moss Warranty Act is not one of them. Thus, to the extent the Magnuson-Moss Warranty Act's service contract provisions apply to the business of insurance, they are effective so long as they do not invalidate, impair, or supersede a State law enacted for the purpose of regulating the business of insurance.

(b) “Written warranty” and “service contract” are defined in sections 101(6) and 101(8) of the Act, 15 U.S.C. 2301(6) and 15 U.S.C. 2301(8), respectively. This means that it must be conveyed at the time of sale of the consumer product and the consumer must not give any consideration beyond the purchase price of the consumer product in order to benefit from the agreement. It is not a requirement of the Act that an agreement obligate a supplier of the consumer product to a written warranty, but merely that it be part of the basis of the bargain between a supplier and a consumer. This contemplates written warranties by third-party non-suppliers.

(c) A service contract under the Act must meet the definitions of section 101(8), 15 U.S.C. 2301(8). An agreement which would meet the definition of written warranty in section 101(6)(A) or (B), 15 U.S.C. 2301(6)(A) or (B), but for its failure to satisfy the basis of the bargain test is a service contract. For example, an agreement which calls for some consideration in addition to the purchase price of the consumer product, or which is entered into at some date after the purchase of the consumer product to which it applies, is a service contract. An agreement which relates only to the performance of maintenance and/or inspection services and which is not an undertaking, promise, or affirmation with respect to a specified level of performance, or that the product is free of defects in materials or workmanship, is a service contract. An agreement to perform periodic cleaning and inspection of a product over a specified period of time, even when offered at the time of sale and without charge to the consumer, is an example of such a service contract.

[42 FR 36114, July 13, 1977, as amended at 80 FR 42722, July 20, 2015]

---

Need assistance?

**OBJECTION:** Safe-Guard objects to this interrogatory as overly broad and unduly burdensome. Safe-Guard further objects to this interrogatory in that this interrogatory together with its discrete sub-parts (i.e., in that it calls for Safe-Guard to provide an answer as to each discrete denial asserted in response to the Plaintiff's complaint) exceeds the number of interrogatories permitted by Fed. R. Civ. P. 33. Safe-Guard objects to this request to the extent that it calls for the disclosure of the mental impressions of counsel and information protected by the attorney-client privilege, the attorney work-product doctrine, or any other privilege. Further objecting, Safe-Guard objects to this interrogatory as premature because Safe-Guard has a pending motion to dismiss and has not yet answered the complaint and, in any event, pursuant to Fed. R. Civ. P. 33(a)(2), Safe-Guard objects to answering a contention interrogatory until discovery is completed.

4. Identify all documents, facts, and persons with knowledge thereof which support each of your Affirmative Defenses.

**OBJECTION:** Safe-Guard objects to this interrogatory as overly broad and unduly burdensome. Safe-Guard further objects to this interrogatory in that this interrogatory together with its discrete sub-parts (i.e., in that it calls for Safe-Guard to provide an answer as to each discrete denial asserted in response to the Plaintiff's complaint) exceeds the number of interrogatories permitted by Fed. R. Civ. P. 33. Safe-Guard objects to this request to the extent that it calls for the disclosure of the mental impressions of counsel and information protected by the attorney-client privilege, the attorney work-product doctrine, or any other privilege. Further objecting, Safe-Guard objects to this interrogatory as premature because Safe-Guard has a pending motion to dismiss and has not yet answered the complaint or asserted any affirmative defenses and, in any event, pursuant to Fed. R. Civ. P. 33(a)(2), Safe-Guard objects to answering a contention interrogatory until discovery is completed.

5. List separately all persons or entities to whom any charges, fees, or any other amounts were paid in connection with the transaction, including the name, address, and telephone number of the payee, the amount disbursed to each, the date of disbursal, and the transmittal, invoice, or check number for each disbursal.

**OBJECTION:** Safe-Guard objects to this interrogatory as vague and ambiguous in that it is unclear what information the Plaintiff is seeking. Moreover, Safe-Guard objects to this interrogatory as overly broad, unreasonably burdensome, and not relevant to any claim or defense in this action and not proportional to the needs of the case in that it seeks information concerning transactions not involving the Plaintiff. Safe-Guard further objects to the extent that this interrogatory seeks information that contains confidential, proprietary or sensitive business information. Safe-Guard further objects to the extent that this request seeks information that contains

**confidential, proprietary or sensitive business information.**

6. Provide the number and percentage of Fairfield Hyundai transactions during 2014 that included Safe-Guard coverage, and list all prices at which that coverage was sold.

**OBJECTION: Safe-Guard objects to this interrogatory as vague and ambiguous in that it is unclear what information the Plaintiff is seeking. Moreover, Safe-Guard objects to this interrogatory as overly broad, unreasonably burdensome, and not relevant to any claim or defense in this action and not proportional to the needs of the case in that it seeks information concerning transactions not involving the Plaintiff. Safe-Guard further objects to the extent that this interrogatory seeks information that contains confidential, proprietary or sensitive business information. Moreover, Safe-Guard objects to this interrogatory in that it seeks information concerning Fairfield Hyundai's 2014 sales volume which is not within Safe-Guard's possession, custody, or control.**

7. Provide the number and percentage of Fairfield Hyundai transactions during 2014 that included VIN Etch, and the type of documentation you maintain as to when and how that service was provided.

**OBJECTION: Safe-Guard objects to this interrogatory as vague and ambiguous in that it is unclear what information the Plaintiff is seeking. Moreover, Safe-Guard objects to this interrogatory as overly broad, unreasonably burdensome, and not relevant to any claim or defense in this action and not proportional to the needs of the case in that it seeks information concerning transactions not involving the Plaintiff. Safe-Guard further objects to the extent that this interrogatory seeks information that contains confidential, proprietary or sensitive business information. Moreover, Safe-Guard objects to this interrogatory in that it seeks information concerning Fairfield Hyundai's 2014 sales volume which is not within Safe-Guard's possession, custody, or control.**

8. Set forth the amount you paid to any third party for the VIN Etch for the transaction.

**OBJECTION AND RESPONSE: Safe-Guard objects to this interrogatory as vague and ambiguous in that it is unclear what information the Plaintiff is seeking. Moreover, Safe-Guard objects to this interrogatory as overly broad, unreasonably burdensome, and not relevant to any claim or defense in this action and not proportional to the needs of the case in that it seeks information concerning transactions not involving the Plaintiff.**

8. All other documents, logs, contracts, and correspondence relating to plaintiff's transaction including the inside and outside of the front and back of the deal jacket or file or transaction folder, the front and back of repair orders, canceled checks, receipts, etc.

**OBJECTION: Safe-Guard objects to this request as vague and ambiguous in that it is unclear what documents the Plaintiff is seeking. Moreover, to the extent that the Plaintiff seeks any documents beyond the Vehicle Service Agreement and directly concerning that specific agreement, Safe-Guard objects to this request as overly broad, unreasonably burdensome, and not relevant to any claim or defense in this action and not proportional to the needs of the case. Safe-Guard further objects to the extent that this request seeks information that contains confidential, proprietary or sensitive business information.**

9. All agreements between defendants concerning the sale of Safe-Guard products.

**OBJECTION: Safe-Guard objects to this request as vague and ambiguous in that it is unclear what documents the Plaintiff is seeking. Moreover, to the extent that the Plaintiff seeks any documents beyond the Vehicle Service Agreement and directly concerning that specific agreement, Safe-Guard objects to this request as overly broad, unreasonably burdensome, and not relevant to any claim or defense in this action and not proportional to the needs of the case. Safe-Guard further objects to the extent that this request seeks information that contains confidential, proprietary or sensitive business information.**

10. All communications between defendants concerning the sale of the SafeGuard product to plaintiff.

**OBJECTION: Safe-Guard objects to this request as vague and ambiguous in that it is unclear what documents the Plaintiff is seeking. Moreover, to the extent that the Plaintiff seeks any documents beyond the Vehicle Service Agreement and directly concerning that specific agreement, Safe-Guard objects to this request as overly broad, unreasonably burdensome, and not relevant to any claim or defense in this action and not proportional to the needs of the case. Safe-Guard further objects to the extent that this request seeks information that contains confidential, proprietary or sensitive business information. Safe-Guard objects to the request to the extent it seeks disclosure of information protected by the attorney-client privilege, joint or common interest privilege, and other applicable privileges, protections or rules of confidentiality, or which otherwise**

**RESPONSE:** **Safe-Guard admits that the Plaintiff reported that the problem with her vehicle concerned a knock sensor which is not covered under the terms of the Vehicle Service Agreement purchased by the Plaintiff. Safe-Guard lacks knowledge or information sufficient to admit or deny the truth of the assertion that the problem in fact was related to the knock sensor because the information that Safe-Guard knows and which Safe-Guard can readily obtain after having made a reasonable inquiry without formal discovery in this matter is insufficient to enable Safe-Guard to admit or deny this request.**

Adm.

4. On the date of her purchase of the Mini Cooper, Fairfield Hyundai charged plaintiff $2,500 for the Safe-Guard extended service contract valid up to 100,000 miles or 84 months.

**RESPONSE:** **Denied.**

5. Fairfield Hyundai represented that the service contract was valid and in force as of February 17, 2015.

**RESPONSE:** **Safe-Guard lacks knowledge or information sufficient to admit or deny the truth of the matter asserted because the information that Safe-Guard knows and which Safe-Guard can readily obtain after having made a reasonable inquiry without formal discovery in this matter is insufficient to enable Safe-Guard to admit or deny this request.**

6. Fairfield Hyundai represented that the manufacturer's warranty was valid and in force as of February 17, 2015.

**RESPONSE:** **Safe-Guard lacks knowledge or information sufficient to admit or deny the truth of the matter asserted because the information that Safe-Guard knows and which Safe-Guard can readily obtain after having made a reasonable inquiry without formal discovery in this matter is insufficient to enable Safe-Guard to admit or deny this request.**

7. The service contract, drafted by Safe-Guard, consisted of 11 pages of fine print.

41. Fairfield Hyundai did not pay any entity any portion of the charges for the GAP contract, for the service contract, or for the VIN etch amounts included in plaintiff's transaction.

**RESPONSE: Safe-Guard lacks knowledge or information sufficient to admit or deny the truth of the matter asserted because the information that Safe-Guard knows and which Safe-Guard can readily obtain after having made a reasonable inquiry without formal discovery in this matter is insufficient to enable Safe-Guard to admit or deny this request.**

DEFENDANT, SAFE-GUARD PRODUCTS INTERNATIONAL, LLC

By: ______________________

Joseph K. Scully (ct26541)
*jkscully@daypitney.com*
Day Pitney LLP
242 Trumbull Street
Hartford, CT 06103-1212
Tel.: (860) 275-0100
Fax: (860) 275-0343

Certificate of Service

I hereby certify that on February 18, 2016, a copy of foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

____/s/ Joanne S. Faulkner___